UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES ANTHONY DULAK,

       Petitioner,

                                   CASE NO. 14-12925

v.

                                   PAUL D. BORMAN

PAUL KLEE,                         UNITED STATES DISTRICT JUDGE

       Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY

      This is a habeas corpus case under 28 U.S.C. § 2254. Petitioner James Anthony Dulak ("Petitioner") challenges his conviction for first-degree (felony) murder, Mich. Comp. Laws § 750.316(1)(b). Petitioner argues through counsel that his trial and appellate attorneys were ineffective, that the state prosecutor committed misconduct, that a co-defendant who testified against him committed perjury, and that the jury instructions were deficient. Respondent Paul Klee urges the Court to deny the petition for lack of merit in the claims and because four of the claims are time-barred, procedurally defaulted, or barred by the non-retroactivity doctrine. The Court agrees that Petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

# I. Background

## A. The Charge, Trial Testimony, Verdict, and Sentence

Petitioner was charged with murdering Mark Keller ("Keller") during a robbery or larceny at Keller's home in Menominee County, Michigan on May 11 or 12, 2008. The medical examiner who performed the autopsy on Keller testified that Keller was struck approximately sixty-three times and that the cause of death was head injury caused by at least three or four blows with a blunt object. The prosecutor's theory was that Petitioner caused Keller's death or aided and abetted Keith Benson ("Benson") and Guy Buck ("Buck") in killing Keller. Petitioner's theory was that he merely planned to beat and rob Keller, with the help of Benson and Buck, but that he never intended to kill or seriously injure Keller or create a situation that would cause serious injury to Keller. The case was tried before a jury in Menominee County Circuit Court where the following persons were among the many witnesses who testified.

Prosecution Witnesses

Ryan Johnson

Ryan Johnson testified that he knew Petitioner, Benson, and Buck and that, in May of 2008, he asked Buck whether he could park his white Toyota pickup truck at Petitioner's and Buck's apartment complex for a few weeks. He did not give anyone permission to use his truck while it was parked there, and he not give his truck keys to anyone. He later learned from the authorities that his truck may have been used in a crime committed by Petitioner, Benson, and Buck. At trial, Johnson identified pictures of

the interior of his truck, which had a handkerchief hanging from the place where the ignition was punched out.

Mitchell Hefty

Mitchell Hefty testified that about 5:00 a.m. on Monday, May 12, 2008, Petitioner stopped at Hefty's home in Birnamwood, Wisconsin and stated that he had a truckload of things which he wanted to store at Hefty's place. Hefty told Petitioner that he could not store the things at his place.

Andy Fleischman

Andy Fleischman testified that he knew Petitioner and Buck and that, about 9:00 or 9:30 a.m. on May 12, 2008, Buck called his knickknack shop in Antigo, Wisconsin and asked Fleischman whether he wanted to buy some guns. Because Fleischman thought the guns might be stolen, he told Buck that he would think about it and that Buck should call him back in half an hour. In the meantime, Fleischman called the Langlade County Sheriff's Department to ask whether the sheriff's office could trace guns if he had the serial number for the guns. Buck's name was mentioned during the conversation, and he learned that there were outstanding warrants for Buck's arrest. Later that morning, Buck, Petitioner, and another person arrived at Fleischman's shop and showed him fourteen to sixteen guns in the trunk of their car. Fleischman told the three visitors that he had to go to the bank to get some money and that he would meet them at his house in half an hour. He then left the shop, and the three men went in the opposite direction.

Mark Hoerman

Langlade County Investigator Mark Hoerman testified that he surveilled Andy Fleischman's shop on May 12, 2008, because had learned that Buck would be showing up, and he knew that there were two outstanding warrants for Buck's arrest. About 10:00 a.m., he saw a red car arrive at the shop. A few people got out of the car, but they left in the car shortly afterward. He followed the car, and when he stopped it, he saw that Benson was the driver, Petitioner was seated in the front passenger seat, and Buck was in the backseat with some chainsaws and pneumatic tools. He arrested Buck on the two outstanding warrants, and he arrested Petitioner for possession of drug paraphernalia. He removed guns from the trunk of the car.

Michael Borski

Michigan state trooper Michael Borski collected the clothes that Petitioner was wearing at the time of his arrest. He noticed what appeared to be a spot of dried blood on Petitioner's belt. He arranged to have the belt processed by the Michigan State Police crime lab.

Tashia Schwoch

Petitioner's former girlfriend, Tashia Schwoch, testified that, in October or November of 2007, Petitioner mentioned a handicapped man named Mark Keller who would be an easy target to rob. Petitioner had said that Keller was a drug dealer who never gave his customers a deal. On the evening before Petitioner's arrest, he told her over the telephone that he was about to do something and that he was not sure if he would

make it back.  On the following evening, Monday, May 12, 2008, Petitioner called her from jail and said that she could take whatever she wanted out of his apartment because he would be in jail for a while.  When she and her friend Lanette Steinagel went to the apartment, she noticed a pair of bloody jeans soaking in a pail in the bathtub.  In subsequent telephone conversations with Petitioner, he told her to wash the jeans or to get rid of them.  She subsequently informed the Langlade County police about the jeans and Petitioner's previous comments about Keller charging too much for his pills and being a good person to rob.

### Henry Puphal

Henry Puphal testified that he and Tammy Woellner lived with Petitioner, Buck, and a guy named HipHop for about a month before Petitioner was arrested.  On Sunday night, May 11, 2008, he went to sleep about 9:00 p.m.  He did not hear Petitioner, Buck, and HipHop leave the apartment, but about 5:30 or 6:00 the next morning, he heard the three men come into the apartment.  Petitioner and Buck had blood on their pants, and all three men were nervous or agitated.  The men had money, and they were whispering about tying someone up with duct tape and beating the man.  One of them also talked about the sound of a nose breaking, and Petitioner told Puphal that the reason they did it was because the guy had gotten Petitioner hooked on OxyContin.  The men gave Puphal money with which to buy cocaine, and after he returned with the cocaine, the group smoked it.  Petitioner, Buck, and HipHop then left the apartment to get rid of some guns.

<u>Tammy Woellner</u>

Tammy Woellner testified that she and Henry Puphal were living in Petitioner's apartment with Buck and HipHop in May of 2008. During the afternoon of May 11, 2008, Petitioner was talking with Buck and HipHop about having to settle up with a mean, one-armed man who had OxyContin and a lot of "stuff." Petitioner asked Buck and HipHop to go with him to settle up with the man. She subsequently fell asleep, but about 5:30 a.m. the next morning, Buck woke her up and asked her to look at some bottles of pills and to explain what the pills were used for. Buck and Petitioner had blood on their pants, and Petitioner told Buck to wash Petitioner's boots. Petitioner told Woellner that whatever she saw in the house stayed in the house. Buck divided up the money that he was counting, and both Petitioner and Buck talked about pawning some guns. The men went to buy cocaine, and when they returned, everyone in the apartment smoked the cocaine. Petitioner, Buck, and HipHop left the apartment about 10:00 a.m. A little while later, she and Puphal got a text message stating that Petitioner, Buck, and HipHop had been arrested and that she and Puphal should get out of the apartment.

<u>Amelia Proctor</u>

Forensic scientist Amelia Proctor testified that Keller's DNA was present in a blood stain on the black belt in evidence.

<u>Jean Belanger</u>

Detective Sergeant Jean Belanger of the Michigan State Police testified that a list of guns found at Keller's home included nine of the same guns that were seized from

Petitioner, Benson, and Buck during their arrest. This information led her to believe that the three men were involved in the robbery at Keller's home and Keller's death. Petitioner, Benson, and Guy were confined at the Langlade County Jail at the time, and she arranged for warrants to seize the men's clothing, the car they had been riding in at the time, and Petitioner's apartment. In addition, Ryan Johnson's white pickup truck, which had been observed on Keller's property on May 12, 2008, was located, and Johnson informed the police about Henry Puphal and Tammy Woellner, whom the police eventually located. At some point, Benson was transferred from Wisconsin to Menominee County, Michigan where he was interviewed. A plea agreement was reached, and Benson agreed to provide truthful testimony.

Keith Benson

Benson testified that, he, Buck, Henry, and Tammy were present at Petitioner's apartment on May 11, 2008, when he brought up the idea of a robbery as a way of getting money. It was Petitioner's idea to go to Keller's place. Petitioner said that Keller had only one arm, that Keller would be doped up, and that he wanted to rob Keller because Keller had overcharged him for painkillers. The three men then decided to go to Keller's place, tie him up, beat him, and steal his tools, guns, drugs, and money because he had "ripped off" Petitioner. They stole their friend Johnson's white pickup truck, which was in the parking lot, and went to Keller's place. Petitioner said, "Don't let me kill Keller," but the only weapon they took with them was a hammer for the dog they anticipated finding at Keller's residence.

When they reached Keller's place, Keller admitted him (Benson) and Buck. They proceeded to ask Keller where his drugs and money were. He hit Keller in the chin, according to the plan. Buck beat Keller with the handle of the hammer and used his knee to strike Keller in the head. While Benson attempted to tie up Keller's arm and Buck was beating Keller, Petitioner came inside the home, ran to the back room, and gathered guns and tools. Petitioner later held Keller down as Benson tied up Keller with duct tape. The three men found money, pills, tools, and guns, which they put in the truck. Petitioner stomped on the back of Keller's head and beat Keller with his fist and boot while Keller laid on a sofa. As they were leaving, Petitioner broke the porch light. Back in Wisconsin, they dropped off the guns and chain saws at Mitch's place and then went to Petitioner's apartment where they split the money and smoked some drugs. They changed their clothes, picked up the guns from Mitch's place, and put the guns in Benson's car. They were arrested shortly afterward.

Benson explained that he was charged with first-degree murder and initially lied to the police, but he subsequently agreed to plead guilty to second-degree murder in exchange for his truthful testimony. The plea agreement called for a minimum sentence of twenty to twenty-five years in prison.

Defense Witnesses

Petitioner did not testify, but he presented three witnesses in his defense. The first defense witness was Menominee Police Officer Brooke Foster who testified that she lived about a mile south of where Keller lived and that she took a video of a white Toyota truck

at Keller's home on May 11. She took the video because there had been talk about narcotic sales occurring there and she thought the place was worth monitoring.

The second defense witness, Detective Jean Belanger, testified about her interview with Buck and the similarities and differences between Buck's custodial statement and Benson's trial testimony. Buck told Detective Belanger that Petitioner was the leader of the group and that the plan was for the three men to rob Keller and retrieve some of Petitioner's things. Buck explained that the three men brought duct tape with them to Keller's residence for the purpose of tying up Keller. They taped his eyes so that he could not see Petitioner, who was the only one of the three men who knew Keller. Petitioner also wore a bandana over his face and changed the tone of his voice so that Keller would not recognize him. They filled their trunk with guns and tools and then left Michigan about 2:00 a.m. Back in Wisconsin, they left the stolen items at Mitch Hefty's house about 4:30 or 5:00 a.m. They got $800 in cash, but they never intended for Keller to die.

Detective Belanger noted that Buck's statement differed from Benson's testimony in the following ways: Buck said that Petitioner and Benson went in the house first, not Benson and Buck; Buck said that he, not Petitioner, initially stayed outside while the beating was happening; Buck denied hitting Keller with a hammer; and Buck denied being involved in the beating. Detective Belanger thought that Benson's facts were more consistent with the evidence than Buck's version of the facts.

The third and final defense witness was Dr. David Luoma, who testified that Keller was prescribed two different long-acting opiates, which were not commonly prescribed together. Dr. Luoma also stated that Keller had sustained multiple brain injuries and that a blow inflicted by a knee or any violent force to the head could lead to brain stem injuries.

At the conclusion of the case, the trial court instructed the jurors on felony murder and on the lesser offense of involuntary manslaughter. On October 20, 2009, the jury found Petitioner guilty, as charged, of felony murder, and on January 14, 2010, the trial court sentenced Petitioner to life imprisonment without the possibility of parole.

## B. The Direct Appeal and Post-Conviction Proceedings

In an appeal of right, Petitioner argued through counsel that: (1) he was entitled to a new trial or an evidentiary hearing on the basis of a letter which Benson wrote to the trial court after Petitioner's trial; (2) his trial attorney was ineffective; and (3) the prosecutor deprived him of due process and a fair trial. The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished, *per curiam* opinion. *See People v. Dulak,* No. 296639, 2011 WL 1781898 (Mich. Ct. App. May 10, 2011). On November 21, 2011, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Dulak*, 490 Mich. 912 (2011).

On November 19, 2012, Petitioner filed a *pro se* motion for relief from judgment in which he alleged that his trial and appellate attorneys were ineffective. The state trial court denied Petitioner's motion after concluding that Petitioner was competently

represented by trial and appellate counsel and that Petitioner's allegations lacked merit. *See People v. Dulak*, No. 08-003253-FC (Menominee Cty. Cir. Ct. Jan. 14, 2013.) The Michigan Court of Appeals denied leave to appeal the trial court's decision, *see People v. Dulak*, No. 315164 (Mich. Ct. App. Sept. 24, 2013), and on April 28, 2014, the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Dulak*, 495 Mich. 993 (2014). Petitioner filed a second motion for relief from judgment, but the trial court denied the motion because it was a successive motion and barred by Michigan Court Rule 6.502(G). *See People v. Dulak*, No. 08-003253-FC (Menominee Cty. Cir. Ct. Sept. 16, 2014.)

## C. The Habeas Petition, Amended Brief, and Responsive Pleading

On July 26, 2014, Petitioner filed his habeas petition. He raised two claims: (1) his trial attorney was ineffective and (2) the prosecutor deprived him of due process and a fair trial. In an amended brief, filed on December 14, 2014, Petitioner raises the following four additional issues: (3) Benson committed perjury at his trial; (4) the trial court's jury instructions were erroneous or incomplete; (5) trial counsel was ineffective; and (6) appellate counsel was ineffective for failing to raise all his claims on direct appeal.

Respondent Paul Klee argues in an answer to the petition and amended brief that the four new claims (three through six) are barred from substantive review by the one-year statute of limitations and by the doctrine of procedural default. Respondent also contends that the non-retroactivity doctrine applies to Petitioner's claim about the jury

instructions. Petitioner replies that his new claims relate back to his timely initial petition, that the non-retroactivity rule is not a bar to review, that the procedural defaults should be excused, and that his original claims warrant habeas relief.

The United States Supreme Court has said that the statute-of-limitations defense is not jurisdictional, because "[i]t does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" *Holland v. Florida*, 560 U.S. 631, 645 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 205, 208 (2006)). Thus, the Court may, "in the interest of judicial economy, proceed to the merits of [the] petition." *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006) (cited with approval in *Smith v. Ohio Dep't of Rehabilitation and Corr.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006)).

"[A] procedural default, that is, a critical failure to comply with state procedural law, [also] is not a jurisdictional matter." *Trest v. Cain*, 522 U.S. 87, 89 (1997). And to obtain relief on procedurally defaulted claims, a habeas petitioner "must establish cause and prejudice for the defaults. He must also show that the claims are meritorious." *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010) (internal citation omitted).

Claims three through six lack merit for the reasons given below. And because "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), the Court "cut[s] to the merits here, since the cause-and-prejudice analysis adds nothing but complexity to the case." *Babick*, 620 F.3d at 576.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.

Further, " '[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct,' unless rebutted by 'clear and convincing evidence.'"  *Holland v. Rivard*, 800 F.3d 224, 242 (6th Cir. 2015) (quoting 28 U.S.C. § 2254(e)(1)), *cert. denied*, 136 S. Ct. 1384 (2016).  Finally, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.  Analysis

### A.  Claim One:  Ineffective Assistance of Trial Counsel

Petitioner's first claim alleges ineffective assistance of trial counsel.  The "clearly established Federal law" for such claims is *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, Petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."  *Id*. at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*.  The "deficient performance" prong of this test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*  The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).  In a habeas case, moreover, review of an ineffective-assistance-of-counsel claim

> is "doubly deferential," *Cullen v. Pinholster*,  563 U.S. 170, 190, 131 S.Ct.
> 1388, 179 L.Ed.2d 557 (2011), because counsel is "strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Burt v. Titlow*, 571 U.S. —— –, ——, 134 S.Ct. 10, 17, 187 L.Ed.2d 348 (2013) (quoting *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Burt, supra*, supra, at ——, 134 S.Ct., at 13.

*Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curiam*).

## 1. Introducing Evidence of Buck's Statement to a Detective

Petitioner claims that trial counsel was ineffective because she introduced evidence of Buck's custodial statement to Detective Belanger. The statement itself was not admitted in evidence, but trial counsel elicited the content of Buck's statement when she called Detective Belanger as a defense witness and questioned Detective Belanger about Buck's statement to her. Trial counsel's direct examination of Belanger established that Buck's statement was similar in many respects to Benson's trial testimony and that Detective Belanger did not believe Buck when he said things that differed from Benson's version of the facts. (Trial Tr. Vol. VI, at 125-30, Oct. 19, 2009, ECF No. 8-12, Pg ID 1894-1899.) Because Buck did not testify at trial, Petitioner claims that Buck's statement violated his right of confrontation and, therefore, was inadmissible.

The Michigan Court of Appeals considered Petitioner's claim on direct appeal and concluded that trial counsel's decision to introduce Buck's statement was a matter of trial strategy and that Petitioner had not overcome his burden of demonstrating that the strategy constituted ineffective assistance. Petitioner contends that the strategy adversely affected the defense because, in questioning Detective Belanger about Buck's statement,

trial counsel demonstrated that Buck's statement corroborated much of Benson's trial testimony.

The record supports the state appellate court's conclusion that trial counsel's questions were a matter of trial strategy. The strategy was to undermine Benson's testimony by showing that it is common for co-defendants to minimize their own involvement in a crime and try to shift blame to another defendant. (*Id*. at 130-31, 135-36, Pg ID 1899-1900, 1904-05.)

Trial counsel's strategy may have been unwise because Buck's statement to Detective Belanger corroborated Benson's trial testimony. Nevertheless, the allegedly deficient performance did not prejudice Petitioner, given the overwhelming evidence against him, including the testimony of Tammy Woellner and Henry Puphal, who corroborated Benson's testimony in critical aspects. Petitioner has failed to show that his trial attorney's direct examination of Detective Belanger concerning Buck's custodial statement amounted to ineffective assistance.

### 2. Failure to Object to Gruesome Autopsy Photographs

Petitioner alleges that trial counsel should have objected to the admission of gruesome autopsy photographs. Petitioner claims that the number of photographs and their grisly nature were intended to inflame the jury and to invoke an emotional response, which would trigger a desire to hold someone accountable.

In Michigan, gruesome photographs should be excluded if they are not pertinent, relevant, competent, or material on any issue in the case and if they serve only to inflame

17

the minds of the jurors and prejudice them against the accused.  *People v. Eddington*, 387 Mich. 551, 562-63 (1972) (quoting 29 Am. Jur. 2d, Evidence, § 787, pp. 860-61).  But "[p]hotographs may . . . be used to corroborate a witness's testimony," and "[g]ruesomeness alone need not cause exclusion."  *People v. Mills*, 450 Mich. 61, 76 (1995).  The Michigan Court of Appeals, moreover, concluded on review of Petitioner's claim that the autopsy photographs were admissible to assist the jury in understanding medical testimony concerning the cause of death.  The Court of Appeals also stated that the photographs were relevant because they enabled the jury to assess the extent and nature of the blows to Keller's head and torso.  The state court's interpretation of state law binds this Court, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), and because the evidence was admissible under state law, defense counsel was not ineffective for failing to object to the evidence.  *See Alder v. Burt*, 240 F. Supp. 2d 651, 674 (E.D. Mich. 2003) (concluding that trial counsel did not err by failing to object to admissible evidence).

### 3. Failure to Object to Character Evidence

Next, Petitioner claims that trial counsel should have objected to evidence that Petitioner was a drug addict who had prior convictions for burglaries and robberies, similar to the underlying felony in the case for which he was on trial.  The Michigan Court of Appeals determined that the evidence was admissible and, therefore, trial counsel was not ineffective for failing to object to the evidence.  Petitioner responds that the Michigan Court of Appeals failed to take into consideration the similarities between the prior bad acts and the charge for which he was on trial.

18

Only one witness (Kerri Lynn Marks) mentioned that Petitioner had been in jail or prison for burglaries or robberies, and those references to Petitioner's prior convictions were fleeting. (Trial Tr. Vol. IV, at 177, Oct. 15, 2009, ECF No. 8-10, Pg ID 1518.) Objecting to Ms. Marks' testimony about Petitioner's prior convictions would have drawn attention to the convictions, and not drawing attention to a defendant's past conduct can be perfectly sound trial strategy. *Kissner v. Palmer*, 826 F.3d 898, 903 (6th Cir. 2016), *cert. denied sub nom. Kissner v. Harry*, 137 S. Ct. 1081 (2017). Considering that Petitioner was on trial for murder and did not deny participating in the robbery of Keller, trial counsel's failure to object to Ms. Marks' testimony about Petitioner's prior convictions did not amount to deficient performance.

For similar reasons, objecting to Ms. Marks' testimony or preventing any testimony about Petitioner's prior convictions would not have affected the jury's verdict because there was substantial evidence that Petitioner committed a robbery or larceny at Keller's residence. Additionally, he did not deny planning the robbery, and part of the defense strategy was to show that he intended to rob Keller, not kill him. Petitioner has failed to show that he was prejudiced by the lack of an objection to evidence of his past crimes.

As for evidence of Petitioner's drug use, the Michigan Court of Appeals concluded that the evidence was admissible because it provided a motive and context for the crime. Defense counsel, in fact, pointed out during opening statements that Petitioner suffered from foot and back pain and that he became addicted to painkillers which a

doctor had prescribed.  Defense counsel stated that Petitioner planned to rob Keller because "when you're addicted to these drugs, you do what you can to get what you . . . need and avoid the withdrawal."  (Trial Tr. Vol. II, at 28, 30, Oct. 13, 2009, ECF No. 8-8, Pg ID 901 and 903.)

Evidence of Petitioner's drug use also was relevant because there was testimony that Keller sold or traded his prescription drugs to people and that Petitioner wanted to settle matters with Keller because he thought that Keller had mistreated him by overcharging him or causing his addiction.  Because evidence of Petitioner's drug use was relevant and admissible, defense counsel was not ineffective for failing to object to the evidence.

### 4.  Failure to Object to the Prosecutor's Conduct

Petitioner alleges that trial counsel should have objected to the prosecutor's conduct.  The Court has determined in the following section that the prosecutor's conduct was not improper.  Because Petitioner's underlying claim about the prosecutor lacks merit, defense counsel was not ineffective for failing to object to the claimed errors. *Hoffner v. Bradshaw*, 622 F.3d 487, 509 (6th Cir. 2010).

### 5.  Conclusion

"Counsel is strongly presumed to have rendered adequate assistance and [to have] made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Further, both trial counsel and the state appellate court are entitled to the benefit of the doubt.  *Etherton*, 136 S. Ct. at 1151.  Given the deference

that must be accorded trial counsel and the state court, the Court concludes that trial counsel was not ineffective and that the decision of the Michigan Court of Appeals was not contrary to, or an unreasonable application of, *Strickland*. The Court declines to grant relief on Petitioner's first claim.

## B. Claim Two: Prosecutorial Misconduct

Petitioner claims that the prosecutor deprived him of due process of law and an impartial jury by introducing evidence of Petitioner's bad character, by appealing to the jury's sympathy, and by expressing his personal belief in the evidence. The Michigan Court of Appeals reviewed Petitioner's prosecutorial-misconduct claim for "plain error" because Petitioner did not preserve his claim for appellate review by objecting in the trial court. The Court of Appeals then determined that the prosecutor's conduct was proper and appropriate.

### 1. Clearly Established Federal Law

"Claims of prosecutorial misconduct are reviewed deferentially" in a habeas case, *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004), and "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). When the issue is the prosecutor's remarks during closing argument, the "clearly established Federal law" is the United States Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168 (1986). *Parker v. Matthews*, 567 U.S. 37, __, 132 S. Ct. 2148, 2153 (2012) (*per curiam*). In *Darden*, the Supreme Court stated that

it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d [1031, 1036 (11th Cir. 1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642, 94 S.Ct., at 1871.

*Darden*, 477 U.S. at 181; *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 852 (6th Cir. 2017) (noting that the Supreme Court's decisions in *Darden* and *DeChristoforo* "establish that, upon review of claims of prosecutorial misconduct in closing arguments, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process") (internal quotation marks and bracket omitted).

"The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)). The Court therefore must "analyz[e] disputed comments in the context of the trial as a whole and recogniz[e] that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *Henry*, 545 F.3d at 377 (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)).

Further, "[i]n deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must apply the harmless error standard." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citing *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th

Cir. 1979)). On habeas review, an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

## 2. Application

### a. Introducing "Bad Acts" Evidence

Petitioner alleges that the state prosecutor persistently and repeatedly introduced evidence of Petitioner's drug use, prior convictions, and general bad character. The Michigan Court of Appeals, however, stated that the evidence was admissible, and this Court must defer to the state court on matters of state law. *Richey*, 546 U.S. at 76.

Furthermore, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, the state court's decision was not "contrary to" any Supreme Court decision under AEDPA. *Id*. at 513. Petitioner's personal disagreement with the state appellate court's ruling that the evidence was properly admitted "is not cognizable on federal habeas review, inasmuch as it involves no constitutional dimension." *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007).

### b. Appealing to the Jury's Sympathy

Petitioner claims that the prosecutor appealed to the jurors' sympathy during closing arguments by focusing on Keller's handicaps. The disputed comments read:

Mark Keller. Mark was a pack rat as described by his daughter. Mark was also handicapped. That's something we shouldn't lose site (sic) of here. He was missing one arm. He walked with a limp. He suffered a lot of pain.

Mark also suffered approximately 63 blows, 63 blows to his body. Let's not forget that. At least three of these, estimate from Dr. Cohle, led to his death. Because of these 63 blows, Mark suffered pain. He was tortured. He suffered the pain of death. And he was humiliated.

. . . .

. . . And when you plan to go rob someone and hit them and tie them up and duct tape them, the likely result of those actions could be death or great bodily harm, and that's exactly what happened here. Especially when your target is a one-armed, handicapped man who is taking medication.

(Trial Tr. Vol. VII, at 30, 35, Oct. 20, 2009, ECF No. 8-13, Pg ID 1938, 1843).

Prosecutors may not incite the passions and prejudices of the jury by appealing to the jurors' emotions, rather than focusing on the relevant facts, issues, and evidence. *Viereck v. United States*, 318 U.S. 236, 247-48 (1943); *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008). The Michigan Court of Appeals determined that "the evidence concerning Keller's disability and the gruesome circumstances of his death were matters in evidence, and the prosecutor could properly argue reasonable inferences from that evidence." *People v. Dulak,* No. 296639, 2011 WL 1781898, at *3 (Mich. Ct. App. May 10, 2011). This Court finds that that determination was neither contrary to nor an unreasonable application of clearly established federal law.

Even if the Michigan Court of Appeals had concluded that the prosecutor's remarks were improper, the trial court charged the jurors not to let sympathy or prejudice influence their decision. The court also informed the jurors that the lawyers' statements

and arguments were not evidence and that the jurors should base their verdict only on the admissible evidence, which was the witnesses' testimony and the exhibits. (Trial Tr. Vol. VII, 67, 69-70, Oct. 20, 2009, ECF No. 8-13, Pg ID 1975, 1977-78.) Jurors are presumed to follow their instructions, *Richardson v. Marsh*, 481 U.S. 200, 206 (1987), and

> "when isolated remarks are made in the course of a long trial and the jury is given an appropriate cautionary instruction designed to overcome or to dissipate any prejudice caused by the remarks, the error can be harmless."

*United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993) (quoting *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)). Given the long trial in this case and the trial court's cautionary instruction on the attorneys' arguments, the contested remarks were harmless.

### c. Expressing a Personal Belief in the Evidence

Petitioner's third and final claim about the prosecutor is that the prosecutor expressed his personal belief in the evidence by calling Petitioner a liar. The Michigan Court of Appeals stated on review of this claim that the prosecutor's references to Petitioner's credibility were appropriately based on the evidence.

The United States Supreme Court has stated that prosecutors must refrain from interjecting their personal beliefs into the presentation of their cases. *Young*, 470 U.S. at 8-9; *see also United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976) (noting that "it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant").

> Prosecutors can argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences

25

from the evidence. But, they cannot offer their opinions as to credibility of a witness or the guilt of a defendant. *See Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). . . .

As the Supreme Court explained in *Young*, two separate harms stem from such arguments. *Young*, 470 U.S. at 18-19, 105 S.Ct. 1038. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id*. at 18, 105 S.Ct. 1038. Secondly, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id*. at 18-19, 105 S.Ct. 1038.


*Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008).

The remarks in dispute here read:

You're going to hear about credibility. Truthfulness, untruthfulness. I'd like to talk about Mr. Dulak's credibility.
          . . . .

[Dulak] tells [Detective] Hoerman he bought the chain saws at an a[u]ction. I submit you, lie. He bought the power tools. They were his. Lie. He had no knowledge of the pills. Lie. He didn't know the directions to Mitch's place, a guy had worked for. Lie. Tashia asks him about the stolen guns and he blurts out, I inherited those. Lie.

See, he's already trying to plant, maybe for the cops, that these guns weren't stolen because he knows they probably going to hear that.

She asks him something about being a suspect about some – something that happened over in Marinette, and I think it was in reference to the homicide. Says he doesn't know anything. Well, that's a lie. 'Cause he knew something. He was involved.

And he refers to the two idiots, and I'm presuming he's talking about Buck and Benson. And he said he didn't know, what the two idiots were up to. We all know that's a lie.

(Trial Tr. Vol. VII, at 38-39, Oct. 20, 2009, ECF No. 8-13, Pg ID 1946-47.)

A prosecutor may "argue reasonable inferences from the evidence," *Leonard,* 846 F.3d at 852 (quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)), and in this case, there was evidence to support the prosecutor's comments. Furthermore, none of the comments created the impression that the prosecutor knew of evidence that was known to him, but not presented to the jury. Therefore, the state appellate court's finding – that the prosecutor's comments on Petitioner's credibility were appropriately based on the evidence – was objectively reasonable.

Even if the remarks were improper, the evidence against Petitioner was overwhelming, and the trial court instructed the jurors that the attorneys' arguments were not evidence. The trial court also stated that the jurors should only accept what the lawyers said if the lawyers' comments were supported by the evidence or by the jurors' common sense and general knowledge. (Trial Tr. Vol. VII, 67, 69-70, Oct. 20, 2009, ECF No. 8-13, Pg ID 1975, 1977-78.) Curative jury instructions can serve to mitigate the prejudicial effect of a prosecutor's comments. *DeChristoforo*, 416 U.S at 644. Thus, any impropriety in the prosecutor's comments was harmless error.

## C. Claim Three: Perjury

Petitioner asserts that he is entitled to a new trial because Benson perjured himself at Petitioner's trial. In support of this claim, Petitioner relies on a letter which Benson wrote to the trial court after Petitioner's trial. Benson begins his letter by stating that the

state prosecutor and detective threatened him with life imprisonment to make him testify to things that were not true. Benson states that, in return, he got a twenty-year plea agreement, and he put Petitioner and Buck away for life. Benson says he is sorry for that and that he did what the prosecutor and detective wanted him to do even though he knows it was wrong. Benson then goes on to describe what he, Petitioner, and Buck did at Keller's home during the robbery, noting in particular that Petitioner entered Keller's home and began beating him before Benson and Buck could restrain Keller with duct tape, and that Benson saw Petitioner kick Keller between 12 and 20 times. *See* ECF No. 8-16, Pg ID 2399-2400.

Petitioner presented Benson's letter to the Michigan Court of Appeals on direct review and sought a remand for an evidentiary hearing in support of a motion for new trial. The Michigan Court of Appeals initially denied a remand, and in its subsequent dispositive opinion, the Court of Appeals concluded that no remand was needed. The Court of Appeals stated that, at best, Benson's letter would merely provide additional impeachment evidence against Benson who was cross-examined at trial about his plea agreement and changes in his story.

To prevail on a claim that the prosecution relied on false testimony to obtain a habeas petitioner's conviction, the petitioner must show that (1) the testimony was actually false, (2) the testimony was material, and (3) the prosecutor knew the testimony was false. *Amos v. Renico*, 683 F.3d 720, 728 (6th Cir. 2012); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.

28

1989)).  Although Benson's trial testimony was material evidence and although he states in his letter that he was threatened to say things that were not true, he goes on to describe how he, Petitioner, and Buck went to Keller's home, taped and kicked Keller, and stole valuable things.  Benson also states that Petitioner kicked Keller twelve to twenty times.  Because these allegations are similar to what Benson said at trial, the letter fails to show that Benson's trial testimony was actually false and that the prosecutor knew the evidence was false.  Petitioner's perjury claim lacks merit.

To the extent Petitioner is attempting to raise an independent claim of actual innocence, his claim fails, because "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact."  *Id.*

Furthermore, the threshold for showing actual innocence is "extraordinarily high." *Id.* "[W]hatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it," *House v. Bell*, 547 U.S. 518, 555 (2006), because Benson's letter does not exonerate Petitioner.  Instead, it incriminates him.  Also, the evidence at trial, even apart from Benson's testimony, was overwhelming, and, in the state appellate court's words, "[t]he letter contains nothing to suggest that the outcome of defendant's trial would be different if the letter were introduced into evidence on retrial."  *Dulak*,

2011 WL 1781898, at *1.  Therefore, to the extent Petitioner has raised a freestanding claim of actual innocence, his claim is not cognizable in this habeas corpus case. *Herrera*, 506 U.S. at 400; *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007).

## D.  Claim Four:  Incorrect or Inadequate Jury Instructions

Petitioner alleges next that the trial court's jury instructions violated his right to due process.

The only question on habeas review of jury instructions is whether the ailing instructions infected the entire trial with such unfairness as to deprive the petitioner of due process.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  In other words, "[t]o warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair.'"  *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)).

### 1.  The Instruction on Aiding and Abetting

Petitioner challenges the trial court's instruction that the jury could convict Petitioner if he "did something to assist in the commission of the crime" and "intended to help [another] commit the crime."  (Trial Tr. Vol. VII, at 81-82, Oct. 20, 2009, ECF No. 8-13, Pg ID 1989-90.)  In Michigan,

> "[a]iding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. . . .  To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that

30

assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.

*People v. Carines*, 460 Mich. 750, 757-58 (1999) (quoting *People v. Turner*, 213 Mich. App. 558, 568-69 (1995)).

Here, the trial court instructed the jury that Petitioner was "charged with committing felony murder or intentionally assisting someone else in committing it" and that "[a]nyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abettor." The trial court then stated that, to prove the charge, the prosecutor had to prove the following elements beyond a reasonable doubt:

First, that the alleged crime was actually committed either by the Defendant or someone else. . . .

Second, that before or during the crime the Defendant did something to assist in the commission of the crime.

Third, the Defendant must have intended the commission of the crime alleged or must have known that the other person intended its commission at the time of giving the assistance.

(Trial Tr. Vol. VII, at 81-82, Oct. 20, 2009, ECF No. 8-13, Pg ID 1989-90.) This instruction is consistent with the elements of aiding and abetting set forth in *Carines*, and it adequately describes the concept of aiding and abetting.

Petitioner nevertheless contends that the aiding and abetting instruction was deficient because it did not clarify that, to be guilty of felony murder under an aiding and abetting theory, Petitioner had to have foreknowledge and a chance to quit the commission of the murder and the underlying felony. According to Petitioner, he had no foreknowledge that murder would be committed and, therefore, he had no realistic opportunity to quit the crime.

Petitioner relies on *Rosemond v. United States*, 134 S. Ct. 1240 (2014), to support his argument. In *Rosemond*, however, the Supreme Court addressed two federal statutes: 18 U.S.C. § 924(c), which prohibits using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime," and 18 U.S.C. § 2, the federal statute on principals and aiders and abettors. The case has little relevance to Petitioner's case, which involved a charge of felony murder and Michigan's statute on aiding and abetting. And because the jury instructions in Petitioner's case were not so infirm as to deprive Petitioner of due process, he is not entitled to habeas relief on the basis of the aiding and abetting instruction.

## 2. The Lack of an Instruction on Addicted Accomplices

Petitioner claims that the trial court failed to instruct the jury on how to assess testimony from witnesses who are addicted to drugs. Petitioner contends that the trial court should have explained the danger of convicting someone based on the testimony of a witness whose perception of the relevant events was impacted by drugs or an addiction.

Although a few prosecution witnesses, including Benson, admitted to using drugs, none of them claimed that their perception of the events was adversely affected by the use of drugs. Furthermore, the trial court instructed the jurors on accomplice testimony and on how to judge a witness's credibility. (Trial Tr. Vol. VII, at 73-76, Oct. 20, 2009, ECF No. 8-13, Pg ID 1981-84.) Finally, it is important to remember that "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). The Court concludes that the lack of an instruction on how an addiction to drugs might affect a witness's perceptions did not deprive Petitioner of a fair trial, and habeas relief is not warranted on Petitioner's claim.

## E. Claim Five: Ineffective Assistance of Trial Counsel

Petitioner asks the Court to exercise its discretion and to consider additional claims about his trial attorney. The trial court was the only court to issue a reasoned opinion on Petitioner's new claims about trial counsel, and it found no merit in Petitioner's allegations. The court stated that trial counsel competently represented Petitioner. To prevail on his claim here, Petitioner must establish "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

### 1. The Failure to Request, or Object to, Jury Instructions

Petitioner alleges that trial counsel was ineffective for failing to request an "addicted witness" jury instruction and for failing to object to the aiding and abetting

instruction.  But, as pointed out above, the jury instruction on aiding and abetting was consistent with state case law, and the lack of an instruction on addicted witnesses did not deprive Petitioner of a fair trial.  Therefore, trial counsel's approach to the jury instructions did not amount to deficient performance.

### 2.  The Failure to Call an Expert Witness

Next, Petitioner alleges that trial counsel should have called an expert witness to challenge the forensic blood evidence.  The Court disagrees because, as explained by the Supreme Court in *Richter*,

> [t]here are . . . "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."  Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach.  It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it. . . .

> . . . .  An attorney can avoid activities that appear "distractive from more important duties."  Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.

*Richter*, 562 U.S. at 106-07 (internal and end citations omitted).

The prosecution's forensic scientist in this case was well qualified,[1] and Petitioner has not provided any basis for concluding that a defense expert would have been able to refute the forensic scientist's DNA analysis and findings.  Furthermore, trial counsel

---

[1] She testified that she had a master's degree in criminal justice with a forensic science concentration, that she had been doing DNA analysis for over ten years, that she had participated in training programs, and that she had previously been recognized as expert in DNA analysis. (Trial Tr. Vol. V, at 74-75, Oct. 16, 2009, ECF No. 8-11, Pg ID 1653-54.)

could have concluded that it was just as effective and more efficient for her to concentrate on cross-examining the prosecution's expert than to call a defense expert. After all, Petitioner's participation in the crime was clear, and the main issue was whether Petitioner had the requisite intent to be found guilty of felony murder. "An attorney need not pursue an investigation that would be fruitless," *id*. at 108, and in this case, testimony from a defense expert could have shifted the jury's attention "to esoteric matters of forensic science," distracted the jury from the main issue of Petitioner's intent, or "transform[ed] the case into a battle of the experts." *Id.* at 108-09. The Court concludes that trial counsel was not ineffective for failing to produce a defense expert at trial.

### 3. The Failure to Adequately Cross-Examine Witnesses

Petitioner alleges next that trial counsel failed to adequately cross examine Detective Jean Belanger and Raymond Tickler about a pill bottle, which Tickler found about a mile and a half north of Keller's residence. Petitioner contends that trial counsel should have cross-examined Belanger and Tickler about a police report, which stated that the bottle was found south of Elmwood. According to Petitioner, the report would have contradicted Belanger and Tickler's testimony that the pill bottle was found north of Elmwood Road, along the co-defendants' escape route.

The pill bottle apparently belonged to Keller, but it was a minor piece of evidence, and pointing to any discrepancies between the police report and the witnesses' testimony about the pill bottle would not have made a difference in the case. Therefore, trial

counsel's allegedly inadequate cross-examination of Belanger and Tickler did not prejudice the defense.

### 4. Waiving the Right of Confrontation

Petitioner alleges that trial counsel waived his right of confrontation without fully explaining what statement she intended to introduce and the fact that she intended to introduce the entire statement. Petitioner is referring to trial counsel's direct examination of Detective Belanger regarding Buck's custodial statement to Belanger and trial counsel's waiver of Petitioner's right to confront Buck about his statement.

Petitioner provides no support for his claim that trial counsel deceived him into waiving his right to confront Buck, and his conclusory allegation of deceit does not justify habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998). Furthermore, the evidence against Petitioner was substantial absent evidence that Buck's custodial statement corroborated Benson's trial testimony. Therefore, Petitioner was not prejudiced by the trial counsel's allegedly deficient performance.

### 5. Third-Party Guilt

In his final claim about trial counsel, Petitioner insinuates that trial counsel was ineffective for failing to suggest that a third party was responsible for Keller's death. In support of this claim, Petitioner contends that there was a conflict between the time of death and when rigor mortis sets in. The county medical examiner, however, stated that the time of death was an educated guess, an estimate, and not a very accurate one. (Trial Tr. Vol. III, at 195-96, Oct. 14, 2009, ECF No. 8-9, Pg ID 1297-98.)

As further support for his claim, Petitioner alleges that, according to police reports, there was a blue Ford Escort at Keller's home on the night of the crime, and Keller's neighbor, Patrick Pichette, owned a blue Ford Escort. (Trial Tr. Vol. V, at 119, 121, Oct. 16, 2009, ECF No. 8-11, Pg ID 1698, 1700.) But Pichette testified that he went to Keller's house regularly to check on him. (Trial Tr. Vol. V, at 123, Oct. 16, 2009, ECF No. 8-11, Pg ID 1702.) There is no evidence in the record indicating that Pichette killed Keller.

Furthermore, to her credit, trial counsel did try to show through the trial testimony and her closing argument that Benson or Buck could have caused Keller's death by striking Keller on the head with a fist or knee. *See, e.g.,* Trial Tr. Vol. VII, at 54, Oct. 20, 2009, ECF No. 8-13, Pg ID 1962. Petitioner's claim, therefore, lacks merit.

### 6. Conclusion

For all the reasons given above, trial counsel's acts and omissions did not amount to deficient performance, and the deficient performance did not prejudice the defense. Therefore, the trial court's conclusion that trial counsel competently represented Petitioner was not contrary to, or an unreasonable application of, *Strickland*, and Petitioner is not entitled to relief on the basis of his supplemental claims about trial counsel.

## F. Claim Six: Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel was ineffective for failing to raise all his claims on direct appeal. To prevail on this claim, Petitioner must show (1) that his

attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal

and (2) there is a reasonable probability that he would have prevailed on appeal if his

attorney had raised the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing

*Strickland*, 466 U.S. at 687-91, 694).

> Appellate counsel "need not advance every argument, regardless of merit,
> urged by the appellant." *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830,
> 83 L.Ed.2d 821 (1985)(emphasis in original). Furthermore, there is no
> constitutional right to have every nonfrivolous issue raised on appeal, *Jones
> v. Barnes*, 463 U.S. 745, 750-54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983),
> and tactical choices regarding issues raised on appeal are properly left to
> the sound professional judgment of counsel. *United States v. Perry*, 908
> F.2d 56, 59 (6th Cir. 1990).

*Workman*, 178 F.3d at 771. In fact, "[t]his process of 'winnowing out weaker arguments

on appeal and focusing on' those more likely to prevail, far from being evidence of

incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477

U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751–52).

Here, appellate counsel obviously winnowed out weaker arguments and focused

on two claims that she thought were more likely to succeed. This was effective appellate

strategy, as Petitioner has raised the same two issues in his habeas petition, and his

remaining claims lack merit for the reasons given above. Further, there is not a

reasonable probability that Petitioner would have prevailed on appeal if his attorney had

raised all his claims on direct review. The Court's inquiry, therefore, "is at an end; by

definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks

merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

## IV.  Conclusion

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts.  The state courts' decisions clearly were not so lacking in justification that there was an error beyond any possibility for fairminded disagreement.  Accordingly, the habeas petition is denied.

## V.  CERTIFICATES OF APPEALABILITY

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition.  Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327.

Reasonable jurists could not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further.  The Court therefore declines to issue a certificate of appealability.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: May 23, 2017

## CERTIFICATE OF SERVICE

 The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 23, 2017.

s/D. Tofil
Deborah Tofil, Case Manager
